# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**ROBERT I.,**[1]

      **Plaintiff,**

                                  **Case No. 1:22-cv-1892**

      **v.**                             **Magistrate Judge Norah McCann King**

**MARTIN O'MALLEY,**
**Commissioner of Social Security,**

      **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Robert I. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

In April 2019, Plaintiff filed this application for benefits, alleging that he has been disabled since September 1, 2017. R. 85, 98, 204–07.[3] The application was denied initially and

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Martin J. O'Malley, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

[3] Plaintiff has filed a number of applications for disability insurance benefits. On October 3, 2012, Plaintiff was awarded benefits after an administrative law judge found that, for the period beginning February 15, 2009 through October 3, 2012, Plaintiff met the criteria of Listing 12.06,

upon reconsideration. R. 133–37, 141–43. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). R. 144–45. ALJ Tracy LaChance held a telephonic hearing on March 11, 2021, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. 28–68. In a decision dated April 30, 2021, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from September 1, 2017, Plaintiff's alleged disability onset date, through the date of that decision. R. 12–23. That decision became final when the Appeals Council declined review on February 23, 2022. R. 1–6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On June 21, 2022, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 7.[4] On that same day, the case was reassigned to the undersigned. ECF No. 8. The matter is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. § 405(g). The United States Supreme Court has explained this

---

which addresses anxiety. R. 116–20 ("the 2012 decision"). After this closed period of disability, Plaintiff worked from May 2015 until August 2017. R. 292. In March 2018, Plaintiff filed another application for disability insurance benefits ("the 2018 application"), which was denied initially on June 26, 2018; Plaintiff did not appeal from that decision. R. 36, 87, 100, 121–32, 200–03.

[4] The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.");

*see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016).  The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight."  *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4.  The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict."  *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review."  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected."  *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short

paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent

such articulation, the Court "cannot tell if significant probative evidence was not credited or

simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

### B.    Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for

determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §

404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the

Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d

632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the

impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.   ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 43 years old on his alleged disability onset date. R. 21. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2022. R. 14. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between September 1, 2017, his alleged disability onset date, and the date of the decision. R. 15.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease, osteoarthritis, major depressive disorder, anxiety disorder, and substance abuse disorder. *Id*.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 15 – 16.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 16–21. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a muffler installer and auto mechanic. R. 21.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs–*e.g.*, approximately 35,000 jobs as an inspector, dowel; approximately 85,000 jobs as an order clerk, food and beverage; and approximately 50,000 jobs as a telephone information clerk–existed in the national economy and could be performed by Plaintiff. R. 21–22. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from September 1, 2017, his alleged disability onset date, through the date of the decision. R. 23.

Plaintiff disagrees with the ALJ's findings at steps two, three, four, and five and

challenges the constitutionality of the appointment of the Commissioner. Plaintiff asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law,* ECF No. 13; *Plaintiff's Reply Brief*, ECF No. 19. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 16.

## IV.    SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.    Samuel Sarmiento, M.D.

On September 20, 2019, Samuel Sarmiento, M.D., conducted a consultative orthopedic evaluation. R. 662–66. Under a heading captioned, "History of Present Illness and Treatment," Dr. Sarmiento noted, *inter alia*, that Plaintiff "*states* that he has stiffness in the joints of the feet and knees. He has difficulty ambulating and uses a cane to ambulate" and "*stated* that he now has difficulty bending and turning his back, weakness in the legs, trouble walking and standing." R. 662–63 (emphasis added). On physical examination, Dr. Sarmiento observed as follows:

**GENERAL OBSERVATION**
The examinee is an adult male who appeared in no acute distress. He is well-nourished and appeared appropriate for his stated age. He was able to get on and off the examining table. He was able to go from lying down to sitting up position. He was able to dress himself. He was comfortable in the seated position during the interview. An orthopedic physical examination was then performed.

**UPPER EXTREMITY EXAMINATION**
Examination of the upper extremities showed no evidence of joint deformity or instability. The upper extremities reveal no warmth. *Shoulders, elbows, wrist, and fingers showed normal range of motion.* There was no significant tenderness to direct palpation of the right or left upper extremities. Biceps, triceps, and brachioradialis deep tendon reflexes were 2+ bilaterally symmetric. There was decreased sensation to pinprick in the left arm and left hand. *Pinch strength and*

*grip strength were 5/5 bilaterally. Muscle strength of the upper extremities, including the biceps and triceps, were graded at 5/5 bilaterally.* The claimant was able to extend the fingers, make a fist, and oppose the thumbs bilaterally.

## LOWER EXTREMITY EXAMINATION
Examination of the lower extremities showed no evidence of joint deformity or instability. The lower extremities reveal no warmth. *Hips, knees, and ankles showed normal range of motion.* There was no significant tenderness to direct palpation of the right or left lower extremities. Patella and Achilles deep tendon reflexes were 2+ bilaterally symmetric. There was decreased sensation to pinprick in the left leg and left foot. *Muscle strength was graded at 5/5 bilaterally in the muscle groups of the lower extremities, including the hip flexors, knee flexors, knee extensors, foot dorsiflexors, foot plantar flexors, and extensor hallucis longus.*

## CERVICAL SPINE EXAMINATION
An examination of the cervical spine showed a normal lordotic curve. *There was decreased range of motion bilaterally in flexion at 40 degrees, extension at 40 degrees, and side bending (lateral flexion) at 30 degrees.* There was no spasm or tenderness to direct palpation of the trapezius, cervical paraspinal muscles, or along the spinous process of the cervical spine. Spurling's Test was negative bilaterally.

## THORACIC SPINE EXAMINATION
An examination of the thoracic spine showed a normal kyphotic curve. *There was normal range of motion bilaterally in flexion, extension, rotation, and side bending (lateral flexion).* There was no spasm and tenderness to direct palpation of the medial scapula, parathoracic, middle trapezius muscle areas, or along the spinous process of the thoracic spine. No winging of the scapula was observed.

## LUMBOSACRAL SPINE EXAMINATION
An examination of the lumbar spine showed a normal lordotic curve. *There was decreased range of motion bilaterally in flexion at 75 degrees, extension at 10 degrees, side bending (lateral flexion) at 15 degrees.* There was no significant spasm and tenderness to direct palpation along the paralumbar musculature and lumbar spinous process. There was no lower back pain or radicular symptoms on sitting straight leg raising maneuver test. There was no lower back pain or radicular symptoms on supine straight leg raising maneuver test at 80 degrees bilaterally.

## GAIT
*The examinee uses a cane to ambulate. The cane was self-prescribed. He uses the cane because of problems with his balance. He was however able to ambulate for a short distance during the examination without the cane. The examinee was able to heel walk, toe walk, and squat without difficulty.*

## X-RAYs
X-rays of both knees and the lumbar spine were ordered however the claimant was not compliant.

9

R. 664–65 (emphasis added). Dr. Sarmiento diagnosed osteoarthritis and back pain. He went on

to summarize his findings and concluded as follows:

> **SUMMARY**
> The claimant is a 45-year-old male, who is not in any distress. *He has no significant motor impairment of both upper extremities*. He has decreased sensation to pinprick in the left arm and left hand. He was able to handle fine and gross manipulations, including the handling of fine and small objects. Grip strength and pinch strength were 5/5 equal bilaterally. *He has no significant motor impairment of both lower extremities*. He has decreased sensation to pinprick in the left leg and left foot. *He uses a cane to ambulate; however, he was able to ambulate for a short distance during the examination without using his cane.*
>
> **CONCLUSION**
> *The claimant had decreased mobility of his neck and low back. He was able to walk for a short distance during the examination without using his cane. He would be able to sit for a reasonable amount [of] time with needed breaks. No significant balance limitations were observed during the evaluation.* He has good use of his upper extremities for movements such as reaching. He has good functionality of his right and left hands. He would be able to handle fine and small sized objects. He has no significant limitations to fingering such as picking and pinching objects.

R. 665 (emphasis added).

**B.    J. Theodore Brown, Jr., Ph.D.**

On October 15, 2019, J. Theodore Brown, Jr., Ph.D. conducted a consultative mental

status examination of Plaintiff. R. 670–74. Plaintiff "appear[ed] nervous but very pleasant and

cooperative throughout the Examination; however he was somewhat tremulous from time to

time" and "appears to be affected by symptoms of depression, panic, anxiety, generalized

anxiety, and seems to have some possible learning disability, as well." R. 670. Dr. Brown noted

that Plaintiff "indicates difficulty getting to sleep, staying asleep, has racing thoughts ongoing,

which either keep him from going to sleep or wake him up." R. 671. He further noted that

Plaintiff "indicates being depressed. He has off and on thoughts of death or suicide. No current

plans or intentions, albeit that there is a history. He has crying episodes all the time, sometimes

10

for no reason. He was crying and tremulous throughout the Examination." *Id*. Plaintiff "denies

any thought disturbance or other behaviors, thoughts, or feelings that require the attention of a

psychiatrist or psychologist." *Id*. Dr. Brown reported as follows:

> **MENTAL STATUS EXAMINATION**: Claimant was pleasant and cooperative
> throughout the Examination. Overall presentation was adequate.
>
> Appearance was same as stated age. Dress was in leisure attire. Hygiene was
> adequate. No prosthetic devices. Gait, posture, and motor behavior - normal. Eye
> contact - appropriate.
>
> **Proverb Interpretation**: When asked to interpret proverbs, Claimant's responses
> were as follows: *You shouldn't judge a book by its cover* – "Don't judge someone
> based upon the way they look." *Don't count your chickens before they hatch* –
> "Don't expect something before you get it." *No need to cry over spilled milk* –
> "Don't worry about little things." **Information**: Claimant's responses to
> information were as follows: Number of months in a year – "12." A thermometer
> is for "temperature." Direction of the sunrise – "To the east." **Memory**: He could
> remember three of three items immediately and one of three after five minutes.
> **Digit Span**: Four digits forward and three digits backwards. **Calculations**: 4 +3 =
> 7, 11 - 5 = 6, 3 x 4 = 12, and 18 + 3 = 9. **Serial 7s/3s**: He could not count backwards
> from 100 by 7s or 30 by 3s. **Judgment**: If he saw smoke coming from his
> neighbor's - he would "call 911." Wallet found on the floor in the store – "Turn it
> in to customer service." Names in the phonebook being in alphabetical order –
> "Make things easier to find." **Similarities and Differences**: Apples and oranges
> are "fruit." Table and chairs – "You sit on them and eat." Piano and guitar – "Play
> music." **Speech**: Fluent and clear. He was able to express thoughts and feelings
> without hesitation or delay. **Thought Processes**: Coherent and goal directed. No
> evidence of illusions, delusions, hallucinations, or paranoia in the Evaluation
> setting. **Affect**: Appropriate to thought content with full range of speech associated
> with thought affect. **Mood**: During the Examination - neutral. **Sensorium**: Clear.
> **Orientation**: He was oriented to person, place, and time. **Cognitive/Intellectual
> Functioning**: Below Average. **General Fund of Information**: He knew Trump
> was president, that there were 52 weeks in a year, and that Trenton was the capital
> of New Jersey. **Insight**: Fair.

R. 672 (emphasis in the original). Dr. Brown diagnosed depressive disorder, unspecified; rule out

major depressive disorder; panic, anxiety disorder; and generalized anxiety disorder. R. 673.

Plaintiff's prognosis was "[u]ndetermined, very much dependent upon Claimant receiving

appropriate mental healthcare support or treatment, receiving appropriate medical care, relief

from physical pain and suffering." *Id*. Dr. Brown recommended that "until

Claimant is under the care of a mental health provider or receives the benefit of such treatment

that he not be allowed to manage his own funds at this time." *Id*.

## V.    DISCUSSION

### A.    RFC, Physical and Mental Impairments, and Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination

because the ALJ failed to properly evaluate Plaintiff's impairments and the opinion evidence.

*Plaintiff's Memorandum of Law*, ECF No. 13, pp. 8–22; *Plaintiff's Reply Brief*, ECF No. 19, pp.

2–6. This Court disagrees.

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R. §

404.1545(a)(1). At the administrative hearing stage, it is the ALJ who is charged with

determining the claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Chandler v. Comm'r of Soc.*

*Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State

agency consultants—must make the ultimate disability and RFC determinations.") (citations

omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence.

*Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only

"credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see*

*also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to

choose whether to include "a limitation [that] is supported by medical evidence, but is opposed

by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject

evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the

discretion to include a limitation that is not supported by any medical evidence if the ALJ finds

the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC to perform a limited range of light work:

> *After careful consideration of the entire record*, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can stand and walk in combination up to six hours, and sit up to six hours in an eight hour workday. His ability to push and pull is unlimited other than the weight limitations should be the same as shown for lift and carry. *He requires a cane in one hand for prolonged ambulation.* He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. *The claimant can sustain concentration, persistence, and pace sufficiently to complete simple, routine tasks over a typical workday and workweek. He can tolerate routine, non-intense interaction with others* in the workplace, including the public, coworkers, and supervisors. He can tolerate occasional changes in routine or the work setting.

R. 16 (emphasis added). In making this determination, the ALJ expressly "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" R. 16–17. The ALJ further considered Plaintiff's subjective statements and found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 17. The ALJ further explained this finding as follows:

> The evidence of record shows that the claimant remains capable of performing a range of work consistent with the light exertional level. Treatment notes, clinical examinations, and daily activities of the claimant are consistent with the ability to engage in work-related activities as described above. His allegations, if fully persuasive, would warrant additional work-related restrictions, but his allegations are not fully persuasive as they are not entirely supported by or consistent with the medical evidence of record. The record also does not contain any opinion statement that persuasively identifies additional work-related restrictions.

*Id*. Nevertheless, the ALJ credited some of Plaintiff's statements and incorporated certain additional limitations into the RFC. R. 16, 18 (noting that Plaintiff testified that he uses a cane,

which had not been prescribed, but that treatment "notes do not document any observations of poor balance"; however, "[v]iewing the evidence in the light most favorable to the claimant, the residual functional capacity allows for use of the cane for prolong[ed] walking, consistent with the claimant's testimony"), 19 (explaining that the RFC contains more restrictions in the light exertional work found by the state agency reviewing physicians, "including a limitation to never climb ladders, ropes, or scaffolds and occasional limitation for the remainder of the postural activities[,]" which "are commonsense restrictions based upon the claimant's testimony regarding his need to use a cane and reports of poor balance").

The ALJ also detailed years of record evidence, including, *inter alia*, evidence that Plaintiff engaged in regular treatment for his physical impairments through his primary care provider and that "[t]reatment notes show the claimant consistently complained of pain and limitation, but clinical examinations do not confirm deficits consistent with the claimant's allegation of limitation"; evidence, as to his mental health functioning, that "[t]he record overall suggests that the claimant's mental health functioning was generally stable. He did not require any higher level of care, medication was effective, and mental status examinations were largely within normal limits"; treatment records that showed that Plaintiff's "depression was stable, though he endorsed some anxiety, which was managed with medication"; evidence that "[m]ental status examination and psychiatric examination were within normal limits"; and evidence that Plaintiff's daily activities "reflect abilities consistent with the" RFC. R. 16–20. In the view of this Court, this record contains substantial evidence to support the ALJ's RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186 F.3d at 429.

Plaintiff, however, raises several challenges to the ALJ's findings, which the Court addresses in turn.

### 1.    Mood disorder with panic and chronic fatigue syndrome

Plaintiff argues that the ALJ failed to find Plaintiff's mood disorder with panic and chronic fatigue to be severe at step two[5] and failed to consider the limitations flowing from these impairments when crafting the RFC. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 15–16; *Plaintiff's Reply Brief*, ECF No. 19, pp. 2–3. Plaintiff's arguments are not well taken.

It is true that the ALJ did not expressly consider Plaintiff's mood disorder with panic and chronic fatigue at step two when identifying Plaintiff's severe impairments. R. 15. However, the ALJ did not deny benefits at that step of the sequential evaluation process; rather, the ALJ continued with the sequential analysis. R. 15–23. Thus, any alleged deficiency at that step was rendered harmless in this case. *See Hicks v. Colvin*, No. 2:15-cv-07221, 2016 WL 8674251, at *8 (D.N.J. Oct. 14, 2016) ("Even if the ALJ had in fact erred with respect to one of the impairments that she found to be non-severe, such error would be harmless since she found other impairments to be severe, engaged in the full five-step evaluation, and accounted for related possible limitations in her RFC finding."); *Auriemma v. Colvin*, No. 13-5947, 2015 WL 5097902, at *6 (D.N.J. Aug. 31, 2015) (citing *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("'Because the ALJ found in [Plaintiff]'s favor at Step Two, even if he had erroneously concluded that some of h[is] other impairments were non-severe, any error was harmless.'"); *cf. Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) ("[N]o incantations are required at steps four and five simply because a particular finding has been made at steps two and three.

---

[5] As previously noted, the ALJ found at step two that Plaintiff's severe impairments were degenerative disc disease, osteoarthritis, major depressive disorder, anxiety disorder, and substance abuse disorder. R. 15.

Those portions of the disability analysis serve distinct purposes and may be expressed in different ways."). Thus, Plaintiff's insistence that "[t]he failure to consider these established medically determinable impairments in the RFC constitutes harmful error to the Plaintiff," *Plaintiff's Memorandum of Law*, ECF No. 13, p. 16, is unavailing. In discussing these conditions, Plaintiff initially identified only difficulty with walking and standing, implying that these were the functional limitations flowing from his impairments of mood disorder with panic and chronic fatigue. *See id*. In reply, Plaintiff clarified that "*potential* limitations resulting from his chronic fatigue syndrome are off task behavior or absenteeism, not problems with walking and standing." *Plaintiff's Reply Brief*, ECF No. 19, p. 3 (emphasis added).[6] However, Plaintiff's rank speculation in this regard is entirely unsupported by any medical opinion. *See id*. As previously discussed, an ALJ need include only "credibly established" limitations, *i.e.*, limitations that are medically supported or otherwise uncontroverted in the record. *Rutherford*, 399 F.3d at 554; *see also Grella v. Colvin*, No. 3:12-cv-2115, 2014 WL 4437640, at *18 (M.D. Pa. Sept. 9, 2014) ("[T]he ALJ cannot accommodate limitations which do not exist, or which cannot be found in the medical record.").

Moreover, many of Plaintiff's citations to the record in support of his assertion that his severe impairments include mood disorder with panic and chronic fatigue syndrome reflect only his own subjective complaints to medical providers or to consultative examiners regarding crying episodes, panic, anxiety, palpitations, sweating, trembling, hyperventilation, chest pressure, and sleep disturbances. *Plaintiff's Memorandum of Law*, ECF No. 13, p. 15 (citing, *inter alia*, R. 258, 663, 671, 727); *Plaintiff's Reply Brief*, ECF No. 19, pp. 2–3 (citing, *inter alia*, R. 671). However,

---

[6] To the extent that Plaintiff contends that the RFC does not fully accommodate his difficulties with walking and standing, particularly based on Dr. Sarmiento's report, the Court addresses these issues later in this decision.

the mere memorialization of a claimant's subjective complaints in a medical record does not transform those complaints into an objective finding or medical opinion. *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005) ("[A] medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report[.]") (summarizing *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir. 1996)); *Morris v. Barnhart*, 78 F. App'x 820, 824–25 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.") (citations omitted); *Famularo v. Comm'r of Soc. Sec.*, No. CV 20-1655, 2021 WL 613832, at *7 (D.N.J. Feb. 17, 2021) ("[A] a claimant's own subjective report about her symptoms[] does not become a medical opinion by virtue of being recorded in treatment notes.") (citations omitted). Notably, the ALJ discounted the intensity, persistence, and limiting effects of Plaintiff's subjective symptoms, R. 17, a finding that Plaintiff does not apparently challenge.

Plaintiff attempts to bolster his argument of harmful error by pointing out that the "previous ALJ also found that he met the Listing of 12.06 in part because of his recurrent severe panic attacks." *Plaintiff's Memorandum of Law*, ECF No. 13, p. 15 (citing R. 119). However, as previously noted, the 2012 decision found that Plaintiff was disabled from February 15, 2009, through the date of that decision, October 3, 2012. R. 116–20. Plaintiff offers no argument—nor does he point to any evidence tending to establish—that the finding of disability during a prior period establishes that Plaintiff suffered from the severe impairments of mood disorder with panic and chronic fatigue syndrome beginning on his current alleged disability onset date, September 1, 2017, through the date of the current decision, April 30, 2021. *See Plaintiff's Memorandum of Law*, ECF No. 13, p. 15.

17

To the extent that Plaintiff relies on a diagnosis of chronic fatigue syndrome, *Plaintiff's Memorandum of Law*, ECF No. 13, p. 15 (citing, *inter alia*, R.  728, 1073), "[a] diagnosis alone . . . does not demonstrate disability." *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act"). As previously discussed, the ALJ need not have considered Plaintiff's speculation that he "potential[ly]" had limitations of off task behavior or absenteeism flowing from his chronic fatigue syndrome. *See Rutherford*, 399 F.3d at 554; *Grella*, 2014 WL 4437640, at *18. Significantly, although one record on which Plaintiff relies notes that Plaintiff was "[p]ositive" for, *inter alia*, "sleep disturbance[,]" that record also states that Plaintiff was negative for, *inter alia*, fatigue. R. 848.

In short, for all these reasons, the Court is not persuaded that the ALJ's failure to expressly consider Plaintiff's mood disorder with panic and chronic fatigue syndrome requires remand.

### 2.        Disability for a twelve-month period

Plaintiff next argues that the ALJ erred by "failing to consider whether the Plaintiff was disabled for at least a 12-month period." *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 16–19 (citing, *inter alia*, *Kangas v. Bowen*, 823 F.2d 775 (3d Cir. 1977)); *Plaintiff's Reply Brief*, ECF No. 19, pp. 4–5. Plaintiff specifically contends that he could not sustain work on a regular and continuing basis due to his "arduous treatment regimen." *Id*. In support of this argument, Plaintiff lists 53 medical appointments scheduled from April 2018 through January 2021.

*Plaintiff's Memorandum of Law*, ECF No. 13, pp. 17–21 (reflecting 14 appointments in 2018; 18 appointments in 2019; 19 visits in 2020; and 2 visits in 2021). Plaintiff argues that this evidence establishes that he would have been absent from work more than the one day per month that, according to the vocational expert, employers would tolerate, thus requiring remand. *Id*. at 19 (citing R. 59).

In response, the Commissioner contends that *Kangas* is distinguishable because the claimant in that case was hospitalized whereas, in this case, Plaintiff simply visited his primary care physician for what was mainly medication-assisted treatment ("MAT") and urine testing. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 16, pp. 9–10 (citing, *inter alia*, R. 663, 675-986, 987–1290). The Commissioner argues that there is no indication in the record that Plaintiff could not schedule these visits at a time consistent with a work schedule. *Id*. at 10. Plaintiff, however, replies that "the record reflects that these appointments were scheduled during a typical workday." *Plaintiff's Reply Brief*, ECF No. 19, p. 4 (citing R. 823, 837, 897, to show that appointments on January 10 and 20, 2020, and on March 13, 2020, were scheduled at 4:45p.m., 2:15 p.m., and 11:15 a.m., respectively). Plaintiff further argues that "this shows that Plaintiff would need to leave work for these appointments so would arguably be off task[,]" contending that the ALJ's failure to consider the frequency of Plaintiff's treatment is harmful because the vocational expert testified that being more than 10% off task is work-preclusive. *Id*. at 5.

Plaintiff's arguments are not well taken. As a preliminary matter, district courts in this circuit—including this Court—have rejected the argument that the claimant was disabled for a 12-month period where, as in the present case, the claimant did not request a "closed period" of disability at the administrative level, "submitted medical records spanning multiple years[,]" and

"argued disability since the pertinent onset date." *Demaske v. Berryhill*, No. 18-18, 2018 WL 6243221, at *2 (W.D. Pa. Nov. 29, 2018) (citing *Maslowski v. Colvin*, No. 15-1833, 2016 WL 1259967 (D.N.J. Mar. 31, 2016)); *see also* R. 224 (reflecting that this is not a closed period case); *Dilwara K. v. Comm'r of Soc. Sec.*, No. CV 20-1557, 2022 WL 2357428, at *2 (D.N.J. June 30, 2022) ("This argument was not made to the ALJ, and it therefore is not a basis to disturb the ALJ's decision. . . . Plaintiff did not request a closed period of disability at any point prior to the ALJ's 2018 decision. . . . And '[a] claimant's failure to request consideration of a closed period of disability precludes the claimant from arguing on appeal to the district court that the ALJ erred by failing to consider the same.'") (citations omitted); *Ward v. Kijakazi*, No. CV 20-1315, 2021 WL 3037711, at *2 (W.D. Pa. July 19, 2021) ("I find that the ALJ did not err in failing to explicitly address a closed period of disability when that request was not made before the ALJ.") (citations omitted).

In addition, the Court agrees with the Commissioner that *Kangas* is distinguishable from the instant case. In *Kangas*, the claimant was hospitalized six times in a sixteen-month period and each hospitalization required a subsequent one-to-two-week recovery at home. *Kangas*, 823 F.3d at 777–78. Conversely, in this case, 50 of Plaintiff's 53 appointments were with Plaintiff's primary care physician, many of them MAT; two of the appointments were the consultative examinations with Dr. Sarmiento and Dr. Brown; and one appointment was for imaging. R. 17–19. As the Commissioner points out, there is no indication in the record that Plaintiff could not schedule these appointments around a work schedule. Notably, this Court previously distinguished *Kangas* where a claimant pointed to more than 60 doctor's appointments in a twenty-month period and rejected the argument that the claimant's frequent need for treatment precluded his ability to work on a regular and continuing basis. *Scott R. v. Kijakazi*, 643 F. Supp.

3d 483, 493–94 (D.N.J. 2022) (distinguishing *Kangas* because the claimant's "course of treatment was not nearly as frequent, lengthy, or disruptive" and that "the inconvenience of these [more than 60] appointments pales in comparison to the lengthy hospitalizations and recovery periods experienced by the plaintiff in *Kangas*. Moreover, unlike *Kangas*, Plaintiff's doctor's appointments were scheduled and he was able to maintain a work schedule despite them" and therefore concluding that "the ALJ did not err in declining to find Plaintiff disabled based on his frequent medical appointments").

Accordingly, the Court is not persuaded that Plaintiff's treatment schedule requires remand.

### 3.   Psychiatric review technique

Plaintiff also argues that the ALJ failed to conduct a proper psychiatric review technique ("PRT"). *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 19–21; *Plaintiff's Reply Brief*, ECF No. 19, pp. 5–6. Plaintiff contends that, although the ALJ found at step three that Plaintiff had moderate limitations in the four areas of mental functioning, "not all limitations were addressed in the RFC." *Plaintiff's Memorandum of Law*, ECF No. 13, p. 19. Plaintiff specifically argues that he would need breaks throughout the day, apparently related to his need to lie down; sleep disturbance; need to nap "a couple of times a week for half hour or hour"; forgetfulness in caring for self; forgetfulness, drowsiness, short attention span, and feeling "loopy" from his medications. *Id*. at 19–20 (citations omitted). According to Plaintiff, his need for breaks and off-task behavior exceeds the limitation that would be work-preclusive. *Id*. (citing R. 59). Plaintiff also contends that his moderate limitation in concentration, persistence, and maintaining pace requires "breaks throughout the day[,]" which were not included in the ALJ's RFC. *Plaintiff's Reply Brief*, ECF No. 19, p. 6. Plaintiff's arguments are not well taken.

All but one of Plaintiff's citations in support pf this argument are simply his own hearing testimony and subjective statements to Dr. Sarmiento. *Plaintiff's Memorandum of Law*, ECF No. 13, p. 20 (citing, *inter alia*, R. 46–47, 51, 54, 671).[7] As previously discussed, however, the ALJ discounted the intensity, persistence, and limiting effects of Plaintiff's subjective symptoms, R. 17, which Plaintiff apparently does not challenge. The Court also previously explained that the memorialization of Plaintiff's subjective complaints in a medical record will not serve to transform those complaints into objective findings or medical opinion. *Hatton*, 131 F. App'x at 879; *Morris*, 78 F. App'x at 824–25; *Famularo*, 2021 WL 613832, at *7.

Moreover, Plaintiff's assertion that he requires breaks or off-task time because of medication side effects is unsupported in, and is inconsistent with, the record. For example, when discussing Plaintiff's mental health treatment, the ALJ expressly noted that Plaintiff's "medication was effective" and "[t]reatment notes do not show that the claimant complained of significant medication side effects." R. 19. Notably, Plaintiff stated in 2019 that he had no negative side effects from his medication and he affirmatively denied side effects to medication in 2020. R. 677 (primary care visit on August 22, 2019,  reflecting that Plaintiff "is compliant with his medication with no negative side effects"), 1226 (primary care visit on December 21, 2020, in which Plaintiff "denies any side effects to medications"), 1230 (same). As this Court has already explained, an ALJ must include only credibly established limitations in the RFC. *See Rutherford*, 399 F.3d at 554; *Grella*, 2014 WL 4437640, at *18.

---

[7] Plaintiff's remaining citation reflects Dr. Sarmiento's statement that Plaintiff can sit for a reasonable amount of time with needed breaks. *Plaintiff's Memorandum of Law*, ECF No. 13, p. 20 (citing R. 665). As previously noted, however, Dr. Sarmiento conducted an orthopedic examination, not a mental examination. R. 662–66. Accordingly, any limitations from this examination relate to Plaintiff's physical impairments, not his mental impairments. The Court addresses Plaintiff's physical limitations and Dr. Sarmiento's opinion later in this decision.

Finally, Plaintiff suggests that the ALJ's RFC failed to accommodate his moderate limitation in his ability to concentrate, persist, and maintain pace. *Plaintiff's Memorandum of Law*, ECF No. 13, p. 20; *Plaintiff's Reply Brief*, ECF No. 19, p. 6. Plaintiff's argument in this regard is not well taken. "[A]s long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 211 (3d Cir. 2019) (explaining that this conclusion "flows directly from our decision in *Ramirez*"). In the present case, the RFC provides that Plaintiff "can sustain concentration, persistence, and pace sufficiently to complete simple, routine tasks over a typical workday and workweek." R. 16. The ALJ's decision offers a "valid explanation" for the finding that a limitation to simple, routine tasks adequately accommodates a moderate limitation in concentration, persistence, or pace. Specifically, when fashioning the RFC, the ALJ expressly relied on, *inter alia*, evidence of Plaintiff's daily activities, including evidence that Plaintiff could go to a store by himself, do simple laundry, do simple cleaning, feed himself, prepare simple meals, dress himself, don and doff his shoes, brush his teeth, bathe, manage his own money, watch television, shop for clothing, and spend time with his children; Plaintiff's mental health functioning was generally stable and he did not require any higher level of care, his medication was effective, and his mental status examinations were largely within normal limits; Dr. Brown's mental status examination revealed, *inter alia*, that Plaintiff had intact thought processes and that Plaintiff could repeat four digits forward and three digits backwards, but that Plaintiff could not count backwards from 100 by 7s or from 30 by 3s; therefore, Dr. Brown's consultative examination revealed "some deficits in functioning in terms of concentration and attention." R. 19–20. Based on this record, *Ramirez* does not require remand nor does it otherwise undermine the ALJ's RFC

determination in this case. *See Hess*, 931 F.3d at 214 (finding that ALJ's explanation was sufficient where the ALJ "highlighted, among other things, the following: mental status examinations and reports that revealed that Hess could function effectively; opinion evidence showing that Hess could do simple work; and Hess's activities of daily living, which demonstrated that he is capable of engaging in a diverse array of 'simple tasks'"); *Menkes v. Astrue*, 262 F. App'x 410, 412–13 (3d Cir. 2008) ("The term 'simple routine tasks,' in the context of the disability proceedings, generally refers to the non-exertional or mental aspects of work. For example, performing a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."); *Long v. Kijakazi*, No. 20-CV-6336, 2022 WL 1204131, at *14 (E.D. Pa. Apr. 22, 2022) (concluding that the ALJ provided a valid explanation for finding that the claimant is capable of performing simple tasks where the ALJ "repeatedly pointed out Plaintiff's 'normal' mental status examinations[,]" "emphasized Plaintiff's ADLs, which included such tasks as childcare for three children (including a one-year-old), house cleaning, woodworking, laundry and shopping[,]" and the claimant's "progress notes consistently showed full orientation, alertness, logical thought processes, fair or normal insight and judgment, and intact reality testing, decision making, attention, concentration, and memory").

### 4.  Listing 12.06

Plaintiff also challenges the ALJ's finding at step three of the sequential evaluation that Plaintiff's mental impairments neither meet nor medically equal a listed impairment, specifically, Listing 12.06. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 21–22. Plaintiff's arguments are not well taken.

At step three, an ALJ considers whether the combination of the claimant's medically determinable impairments meets or medically equals the severity of any of the impairments in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). An impairment meets a listed impairment if it satisfies "'*all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Jones,* 364 F.3d at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (emphasis in original). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the *overall* functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis added). "[T]he medical criteria defining the listed impairments [are set] at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Id.* at 532 (emphasis in original) (quoting 20 C.F.R. § 416.925(a)). Although an ALJ is not required to use "particular language" when determining whether a claimant meets a listing, the ALJ's discussion must provide for "meaningful review." *Jones*, 364 F.3d at 505 (citing *Burnett*, 220 F.3d at 120). Accordingly, if the ALJ's decision, "read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing," "[t]his discussion satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review of the step three determination." *Id*.

Listing 12.06 addresses anxiety and obsessive-compulsive disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. To meet Listing 12.06, a claimant must satisfy this Listing's A criteria and either the paragraph B or paragraph C criteria of this Listing. *Id*. The paragraph A criteria require medical documentation of anxiety disorder, panic disorder or agoraphobia, or obsessive-

compulsive disorder. *Id*. at § 12.06A (detailing requirements that must be met to establish each disorder). The paragraph B criteria are met when a claimant has an extreme limitation of one, or a marked limitation of two,[8] of the following four mental functional areas: the ability to understand, remember, or apply information; the ability to interact with others; the ability to concentrate, persist, or maintain pace; and the ability to adapt or manage oneself. *Id*. at § 12.06B. The paragraph C criteria are met if the claimant's mental disorder is "serious and persistent[,]" *i.e.*, the claimant has a medically documented history of the existence of the disorder over a period of at least two years and there is evidence of both of the following: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder; and (2) marginal adjustment, *i.e.*, the claimant has minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of his or her daily life. *Id*. at § 12.06C.

In the present case, at step two, the ALJ determined that Plaintiff suffered the severe impairment of, *inter alia*, anxiety disorder. The ALJ determined at step three that Plaintiff's impairments, whether considered singly or in combination, did not meet or medically equal Listing 12.06, reasoning as follows:

> In understanding, remembering or applying information, the claimant has a moderate limitation. At a consultative examination, the claimant could remember three of three items immediately and one of three after five minutes (Exhibit B4F). In a function report, he endorsed difficulty with memory and not completing tasks (Exhibit B4E). Clinical examinations in general did not document memory deficits. The claimant was able to attend appointments as scheduled, which reflects an ability to manage information and recall. Nothing in the record suggests he has a marked limitation in this area.

---

[8] A "marked" limitation means that the claimant is seriously limited his ability to function independently, appropriately, effectively and on a sustained basis in a specified area. *Id*. at § 12.00F2d. An "extreme" limitation means that the claimant is unable to function independently, appropriately, effectively on a sustained basis in a specified area. *Id*. at § 12.00F2e.

In interacting with others, the claimant has a moderate limitation. At times, the claimant presented as depressed or anxious, but he was able to exhibit normal mood and behavior (e.g., exhibit B6F; B7F, p. 38). At a consultative examination he made appropriate eye contact despite being tremulous and nervous. He was overall pleasant and cooperative (Exhibit B4F). In a function report, the claimant noted he does not go anywhere on a regular basis, other than seeing his children and doctors. He reported an ability to get along with authority figures, but not handle stress or changes in routine well (Exhibit B4E). The record does not suggest the claimant has a marked limitation in this domain.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. At a consultative examination, the claimant could repeat four digits forward and three digits backwards. He could not count backwards from 100 by 7s or from 30 by 3s (Exhibit B4F). Throughout regular care, mental status examinations were within normal limits and did not document deficits in this area (Exhibits B6F, B7F). In a function report, the claimant endorsed limited ability to maintain attention and not completing tasks (Exhibit B4E).

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant was able to engage in treatment and fully participate. He managed his medications appropriately. The claimant endorsed the ability to go to a store by himself, do simple laundry, do simple cleaning, feed himself, prepare simple meals, dress himself, don and doff his shoes, brush his teeth, and bathe (Exhibit B3F, p. 3). He manages his own money. His hobbies and interest are sports and watching television (Exhibit B4F, p. 3). The record overall shows the claimant has moderate limitations, but nothing that rises to the level of marked limitation in this domain.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

R. 15–16. In addition, as detailed above, the ALJ provided a comprehensive review of the

medical evidence relevant to Listing 12.06, and specifically found at step four, *inter alia*, that the

state agency reviewing consultants' limitations to, among other things, occasional changes in routine were generally persuasive. R. 17–21. The Court finds no error in the ALJ's reasoning in this regard and finds that substantial evidence supports the ALJ's determination at step three as to Listing 12.06. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06; *Jones*, 364 F.3d at 505 (stating that an ALJ is not required to use "particular language" when determining whether a claimant meets a listing, only that the ALJ's discussion must provide for "meaningful review" when "read as a whole"); *Lewis v. Comm'r of Soc. Sec.*, No. 15CV06275, 2017 WL 6329703, at *8 (D.N.J. Dec. 11, 2017) ("In reviewing a case, 20 C.F.R. Part.404, Subpart P indicates that a claimant must prove both Paragraph A and B criteria. The ALJ simply chose to proceed with a full analysis of Paragraph B, and, upon determining that Paragraph B was not satisfied, chose not to address Paragraph A as there would be no point given that the criteria for Paragraph B had already failed.").

Plaintiff nevertheless insists that he "has extreme or at the very least, marked difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace." *Plaintiff's Memorandum of Law*, ECF No. 13, p. 22 (citing R. 119). In support, Plaintiff notes that the ALJ who authored the 2012 decision found that Plaintiff had marked limitations in these functional areas and that "[t]he current ALJ provided no evidence to contradict this finding." *Id*. Plaintiff's argument is not well taken. At step three, it is the Plaintiff—not the Commissioner— who bears the burden of establishing that he meets or medically equals a listed impairment. *See Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (stating that the claimant bears the burden of proof at steps one through four). Accordingly, the ALJ was not required to contradict a prior finding of disability. Moreover, the ALJ's analysis, which includes citations to the record, belies Plaintiff's suggestion that the ALJ did not rely on evidence to support her

conclusion that Plaintiff had only moderate limitations in the four areas of functioning under Paragraph B.

Plaintiff further asserts that his "conditions have also been documented since February 15, 2009 (R. 119) and they can be considered 'serious and persistent' which satisfies 12.06C as he has had ongoing medical treatment that *temporarily* diminishes his symptoms, and he has marginal adjustment or minimal capacity to adapt to changes in his environment." *Plaintiff's Memorandum of Law*, ECF No. 13, p. 22 (emphasis in the original). However, Plaintiff, who bears the burden of proof at step three, offers no substantive analysis of the evidence—or any analysis whatsoever—relative to Listing 12.06. *See id*. The Court will not hunt through the record to find support for Plaintiff's conclusory assertion that he meets or medically equals Listing 12.06. *See Atkins v. Comm'r Soc. Sec.*, 810 F. App'x 122, 129 (3d Cir. 2020) ("'[J]udges are not like pigs, hunting for truffles buried in the record.'") (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)) (internal citation omitted)); *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) ("[T]his Court has frequently instructed parties that they bear the responsibility to comb the record and point the Court to the facts that support their arguments.").

In short, and fairly reading the ALJ's decision as a whole, this Court concludes that substantial evidence supports the ALJ's finding that Plaintiff's mental impairments neither meet nor medically equal any listing, including Listing 12.06.

**5.      Opinion evidence**

In continuing to challenge the ALJ's RFC determination, Plaintiff also contends that the ALJ erred in her consideration of the medical opinions of Doctors Sarmiento and Brown.

*Plaintiff's Memorandum of Law*, ECF No. 13, pp. 22–28; *Plaintiff's Reply Brief*, ECF No. 19, pp. 7–8. For the reasons that follow, Plaintiff's arguments are not well taken.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence.  *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec*., 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed after March 27, 2017,[9] the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with

---

[9] As previously noted, Plaintiff's claim was filed on April 30, 2021.

the claimant, including the length of the treating examination, the frequency of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c).

The regulation emphasizes that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at § 404.1520c(a). As to the supportability factor, the regulation provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(1).  As to the consistency factor, the regulation provides that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(2).

The applicable regulation further requires the ALJ to articulate her "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at § 404.1520c(b).

In the present case, turning first to Dr. Sarmiento's opinion, the ALJ found, *inter alia*, that this physician's opinion had "some persuasive value[,]" reasoning as follows:

Looking to the medical evidence of record, the claimant has a history of degenerative disc disease and osteoarthritis. The record does not contain evidence dating back to the alleged onset date, but the claimant did attend a consultative orthopedic examination with Dr. Sarmiento in September 2019. He reported a history of osteoarthritis and back pain, primarily affecting his hands, hips, knees, ankles, and back, as well as the feet and knees. He endorsed difficulty ambulating and needing to use a cane. Upon examination, the claimant presented in no acute distress. He was able to get on and off the examination table and go from a lying down to sitting up position. He was able to dress himself. He appeared comfortable in the seated position. Upper extremity examination was within normal limits except for decreased sensation to pinprick in the left arm and left hand. Lower extremity examination was within normal limits except decreased sensation to pinprick in the left leg and left foot. The claimant demonstrated decreased range of motion of the cervical spine. Examination of the lumbar spine showed decreased range of motion, but no significant spasm or tenderness, and no pain or no radicular symptoms on seated or supine straight leg raise. The claimant was observed to ambulate for a short distance without a cane. He was able to heel walk, toe walk, and squat without difficulty. He declined x-rays of the knees and lumbar spine. Dr. Sarmiento overall noted the claimant had decreased mobility of the neck and low back, was able to walk for a short distance without using his cane, *was able to sit for a reasonable amount of time with needed breaks*, and demonstrated no significant balance limitations. He noted the claimant had good use of his upper extremities and good functionality of both hands, being able to handle fine and small sized objects. He identified no significant limitations to fingering, such as picking and pinching objects (Exhibit B3F). . . .

As noted, the record does not contain any opinion statement from a treating or examining provider. Consultative examiner Dr. Sarmiento provided a general assessment of the claimant's functioning, *but did not provide any specifics regarding the claimant's ability to sit, stand, walk, nor did he address the claimant's need to use his cane. He did not opine regarding the exertional level. Due to the lack of specifics, this opinion carries only some persuasive value*, noting that it does not suggest that the claimant requires restrictions in excess of those identified above (Exhibit B3F).

R. 17–18 (emphasis added).

Plaintiff challenges the ALJ's finding that Dr. Sarmiento offered no specifics regarding functional limitations, arguing that this physician "does address the Plaintiff's ability to sit, stand, walk, and use a cane" when Dr. Sarmiento "indicated that Plaintiff suffered back pain and decreased mobility of his neck and low back and could sit for reasonable periods of time only with needed breaks"; "noted that Plaintiff has difficulty ambulating and uses a cane to

ambulate"; and "determined that Plaintiff has difficulty bending and turning his back, weakness in the legs, and trouble walking and standing." *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 25–26 (citing R. 662–63, 665); *see also Plaintiff's Reply Brief*, ECF No. 19, p. 7 (same).

This Court disagrees. As preliminary matter, Plaintiff again relies on his own subjective statements to Dr. Sarmiento, *Plaintiff's Memorandum of Law*, ECF No. 13, p. 26; R. 662 (reflecting Plaintiff's self-reported statement that he "has difficulty ambulating and uses a cane to ambulate"), 663 ("He [Plaintiff] stated that he now has difficulty bending and turning his back, weakness in the legs, trouble walking and standing."), a fact that is unavailing for the reasons previously explained.  *See Hatton*, 131 F. App'x at 879; *Morris*, 78 F. App'x at 824–25; *Famularo*, 2021 WL 613832, at *7. Moreover, the Court notes that, contrary to Plaintiff's self-reported limitations, Dr. Sarmiento observed, *inter alia*, that Plaintiff was "able to ambulate for a short distance during the examination without the cane"; "was able to heel walk, toe walk, and squat without difficulty"; and that "[n]o significant balance limitations were observed during the evaluation." R. 665.

It is true that Dr. Sarmiento opined that Plaintiff was "able to sit for a reasonable amount [of] time with needed breaks." R. 665. However, the Court agrees with the ALJ's characterization of this opined limitation as not specific because Dr. Sarmiento does not explain how long "a reasonable amount of time" is or how often Plaintiff needed breaks and how long in duration those breaks should be, nor did he describe the kind of break that was needed, *i.e.*, standing, standing and walk, lying down, etc. R. 18, 665. Moreover, Dr. Sarmiento provided no specific functional limitations regarding Plaintiff's ability to stand or walk. R. 662–66. Although Dr. Sarmiento noted that Plaintiff used a self-prescribed cane to ambulate, the doctor provided no specific functional limitations regarding that assistive device. *Id*. The ALJ therefore properly

discounted, in part, this vague opinion and found it only partially persuasive. R. 18; *see also Pierznik v. Comm'r Soc. Sec.*, No. 22-2369, 2023 WL 4014468, at *1 (3d Cir. June 15, 2023) (stating that the Court would not disturb the ALJ's findings where, *inter alia*, the ALJ discounted opinions that were "'vague' because they failed to address specifically [Appellant's] function-by-function abilities in vocational terms'") (citations omitted), *cert. denied sub nom. Pierznik v. O'Malley*, 144 S. Ct. 1035, 218 L. Ed. 2d 190 (2024); *Anderson v. Comm'r of Soc. Sec.*, No. 21-2009, 2022 WL 1635628, at *4 (3d Cir. May 24, 2022) (finding that, in discounting a medical opinion, the ALJ's explanation that the opinion "was vague and failed to identify 'any specific work related functional limitations'" "suffices under the substantial-evidence standard"). Accordingly, Plaintiff has not established that Dr. Sarmiento's report requires any additional or different RFC limitations.

Turning next to Dr. Brown's opinion, the ALJ expressly considered this consultative examiner's opinion, as follows:

> The claimant also attended a consultative examination with Dr. Brown in October 2019. He presented as nervous but pleasant and cooperative. He was tremulous at times. He made appropriate eye contact. Upon examination, the claimant could remember three of three items immediately and one of three after five minutes. He could repeat four digits forward and three digits backwards. He could not count backwards from 100 by 7s or from 30 by 3s. His speech was within normal limits. Thought processes were intact. His affect was appropriate and his mood was neutral. He was fully oriented. His intellectual functioning was below average (Exhibit B4F). This examination does show deficits in functioning in terms of concentration and attention. . . .
>
> As noted, the record does not contain any opinion statement from a treating or examining provider. *Consultative examiner Dr. Brown did not provide any opinion statement other than suggesting the claimant requires a representative payee*. This is not persuasive as it is not consistent with the claimant's demonstrated daily activities and his ability to manage his own finances (Exhibit B4F).

R. 19–20 (emphasis added).

Plaintiff insists that "Dr. Brown did provide an opinion[,]" and points out that "Dr.
Brown noted that Plaintiff's cognitive/intellectual functioning was below average, and that his
insight was fair. (R. 672-672)"; Dr. Brown "opined that Plaintiff appeared to be affected by
symptoms of depression, panic, anxiety, generalized anxiety, and seemed to have some possible
learning disability. (R. 670)"; he "observed that Plaintiff was crying and tremulous throughout
the Exam and has crying episodes all the time, sometimes for no reason. (R. 671)"; Dr. Brown
"determined that Plaintiff's prognosis was undetermined as it was very much dependent on
Plaintiff receiving appropriate mental healthcare support or treatment, appropriate medical care,
and relief from physical pain and suffering. (R. 673)." *Plaintiff's Memorandum of Law*, ECF No.
13, p. 26; *see also Plaintiff's Reply Brief*, ECF No. 19, pp. 7–8 (same). However, these
statements simply reflect Dr. Brown's observations and diagnoses as well as Plaintiff's
subjective statements and are not opinions of functionality, nor are they statements of the
activities that Plaintiff can or cannot perform in a work setting. *See* 20 C.F.R. § 404.1513(a)(2)
(defining a  medical opinion as "a statement from a medical source about *what you can still do
despite your impairment(s)* and whether you have one or more impairment-related limitations or
restrictions in" certain enumerated abilities) (emphasis added); *Gambriel v. Kijakazi*, No. 1:20-
CV-01393, 2022 WL 808496, at *6 (M.D. Pa. Mar. 16, 2022) ("Observations of symptoms and
diagnoses without an opinion of functionality are not considered medical opinions.") (citations
omitted); *Scheel v. Comm'r of Soc. Sec.*, No. CV 20-5077, 2021 WL 4477163, at *4 (E.D. Pa.
Sept. 30, 2021) (finding that physician's letter did not qualify as a medical opinion that the ALJ
was required to evaluate because that physician "never opined on Scheel's functional limitations
or what activities she could or could not perform in a work setting, or otherwise articulated
Scheel's work-based limitations. Accordingly, Dr. Shipkin's letter does not contain an 'opinion'

as defined in the regulations"). For these reasons, the Court cannot conclude that the ALJ erred in finding that Dr. Brown provided no opinion other than suggesting that Plaintiff required assistance in managing his finances. It follows, then, that the ALJ did not err in failing to include in Plaintiff's RFC any additional or different limitations flowing from Dr. Brown's examination.

Plaintiff goes on to complain that the ALJ erred in relying on and finding persuasive the opinions of the state agency reviewing physicians, "who only had a partial file at the time of the original determination[,]" apparently contending that the ALJ cherry picked evidence when she relied on these opinions rather than on those of the consultative examiners. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 26–27 (citing R. 20); *Plaintiff's Reply Brief*, ECF No. 19, p. 8. This Court disagrees. State agency physicians are experts in Social Security disability programs. SSR 96-6p. An ALJ may rely on a state agency physician's findings and opinions even where there is a lapse of time between the state agency report and the ALJ's decision and where additional medical evidence is later submitted. *Chandler,* 667 F.3d at 361 ("The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing,' is an update to the report required.") (emphasis in original) (citations omitted); *Wilson v. Astrue*, 331 F. App'x 917, 919 (3d Cir. 2009) ("Generally, an ALJ is required to consider the reports of State agency medical consultants; however, there is no requirement that an ALJ must always receive an updated report from the State medical experts whenever new medical evidence is available."). Notably, Plaintiff does not identify any evidence received after the state agency consultants' reviews that would alter or otherwise undermine those agency reviews. *See Plaintiff's*

36

*Memorandum of Law*, ECF No. 13, pp. 26–27; *Plaintiff's Reply Brief*, ECF No. 19, p. 8. In addition, this Court has already explained that substantial evidence supports the ALJ's consideration of Dr. Sarmiento's opinion and Dr. Brown's report and that these consultative examinations did not require any different or additional RFC limitations. Accordingly, Plaintiff has not shown that the ALJ engaged in impermissible cherry picking.

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does her consideration of Dr. Sarmiento's opinion and of Dr. Brown's report.

**B.     Step Five**

Plaintiff challenges the ALJ's step five determination, arguing that remand is required because the ALJ's RFC is inconsistent with the jobs identified by the vocational expert. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 28–32; *Plaintiff's Reply Brief*, ECF No. 19, p. 9. Plaintiff also argues that the ALJ failed to consider "a properly lodged objection[,]" requiring remand. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 32–35; *Plaintiff's Reply Brief*, ECF No. 19, pp. 9–10. Plaintiff's arguments are not well taken.

At step five, an ALJ must decide whether the claimant, considering his RFC and vocational profile, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Unlike at the first four steps of the sequential evaluation process, the Commissioner bears the burden of proof at step five. *Hess*, 931 F.3d at 201; *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford*, 399 F.3d at 551). "'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age,

education, work experience and RFC.'" *Id*. at 205–06 (quoting *Rutherford*, 399 F.3d at 551).

"Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny*, 745 F.2d at 218. "Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy." *Zirnsak,* 777 F.3d at 614 (citing *Podedworny*, 745 F.2d at 218). "While 'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec*., 631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's impairments, the ALJ must include all 'credibly established limitations' in the hypothetical." *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations include limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554. Moreover, "[l]imitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id*. (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it

cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

"As a general rule, occupational evidence provided by a [vocational expert] should be consistent with the occupational evidence presented in the DOT [Dictionary of Occupational Titles]."[10] *Zirnsak*, 777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). Before relying on the testimony of the vocational expert, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] and information in the Dictionary of Occupational Titles[.]" SSR 00-4p, 2000 WL 1898704, at *1. "Specifically, an ALJ is required to (1) ask, on the record, whether the [vocational expert's] testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear, and (3) explain in its decision 'how the conflict was resolved.'" *Zirnsak*, 777 F.3d at 617 (quoting *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)). Although an "ALJ's failure to comply with these requirements *may* warrant remand in a particular case[,]" "this Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id*. (citations omitted) (emphasis added); *see also Jackson v. Barnhart*, 120 F. App'x 904, 905–06 (3d Cir. 2005) ("[E]ven if it was error for the ALJ to fail to solicit testimony about potential conflicts between this portion of the VE's testimony and the DOT, the error was harmless. Where substantial evidence supports the ALJ's

---

[10] The DOT is a "publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy," and which ALJs generally consult to determine whether any jobs exist that a claimant can perform. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

opinion and where the failure to solicit the testimony contemplated in SSR 00-4p is harmless, this court will not reverse the ALJ's decision.") (citations omitted).

In the case presently before the Court, the relevant hypothetical question posed by the ALJ to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 16, 56–58. The vocational expert responded that the jobs of inspector, dowels; order clerk, food and beverage; and telephone information clerk could be performed by such an individual. R. 57–58. In her written decision, the ALJ relied on this testimony in her analysis at step five of the sequential evaluation and rejected Plaintiff's objections as they related to jobs with more than a level one reasoning level:

> If the claimant had the residual functional capacity to perform the full range of sedentary and light work, a finding of "not disabled" would be directed by Medical-Vocational Rules 201.28, 201.21, and 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.
>
> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as inspector, dowel (DOT# 669.687-014; sedentary exertional level; SVP 2; 35,000 positions in the national economy), order clerk, food and beverage (DOT# 209.567-014; sedentary exertional level; SVP 2; 85,000 positions in the national economy), and telephone information clerk (DOT# 237.367-046; sedentary exertional level; SVP 2; 50,000 positions in the national economy). The vocational expert testified that jobs at the light exertional level are generally precluded due to the claimant's need to use a cane. He provided jobs consistent with the sedentary exertional level. After the hearing, attorney Petruzzelli submitted a brief regarding, in part, the testimony of the vocational expert. He argued that the testimony of the vocational expert violated both SSR 00-4P and 20 CFR 404.1566. He argued that four of the six jobs identified by the vocational expert require at least "detailed" instructions, interactions with others, and more than simple tasks. The meat of attorney Petruzzelli's argument is that the job numbers identified are not valid as these positions have reasoning levels of two, which exceeds the limitations based in the residual functional capacity based upon the Dictionary of Occupational Titles definition, which states that jobs with a reasoning level of two involve "detailed but

uninvolved" instructions. This argument is not persuasive or compelling. There is no conflict between the vocational expert testimony and the Dictionary of Occupational Titles when considered in terms of the regulatory framework. As defined in 20 CFR 404.1568(a), unskilled work is that which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. SSR 85-15 sets forth that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Furthermore, it is noted that when this issue has been considered by the federal district courts, most have addressed the issue by ruling that the reasoning code two jobs are consistent with a limitation to simple, routine tasks. Attorney Petruzzelli did not cite to any authority to support the contention that this case should be evaluated differently. Considering the testimony of the vocational expert in its entirety and within the framework of the regulations, this testimony is consistent with the DOT as it is applied to Social Security regulations and rulings; it is accepted as valid.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

R. 21–22.

Plaintiff argues that the jobs identified by the vocational expert exceed the RFC limitations regarding Plaintiff's ability to engage in social interaction and reasoning level. Plaintiff first contends that the ALJ's RFC restricts Plaintiff to, *inter alia*, routine, non-intense interaction with others in the workplace, including the public, coworkers, and supervisors, which the ALJ defined as not working closely with others for prolonged periods and not dealing with matters that would be more stressful, such as taking customer complaints. *Plaintiff's Memorandum of Law*, ECF No. 13, p. 30 (citing R. 16, 61). According to Plaintiff, however, the vast majority of each of the three jobs identified by the vocational expert require constant contact

with others. *Id*. at 30–31 (citing data from the Bureau of Labor Statistics). Plaintiff argues that the vocational expert testified that the Bureau of Labor Statistics is a reliable source and that she relied on it when proffering her job data and using it in statistical analyses. *Id*. at 30–31 (citing R. 61–62). Because the RFC limitations conflict with the Bureau of Labor Statistics, Plaintiff argues, the jobs identified by the vocational expert are not consistent with Plaintiff's RFC and the ALJ's failure to identify and resolve these conflicts constitutes harmful error. *Id*.; *Plaintiff's Reply Brief*, ECF No. 19, pp. 9–10.

The Court is not persuaded that this issue requires remand. As previously explained, a vocational expert's testimony generally should be consistent with the DOT and an ALJ therefore must identify and obtain a reasonable explanation for any conflicts between that testimony and the DOT before relying on such testimony. *Zirnsak*, 777 F.3d at 617; SSR 00-4p, 2000 WL 1898704, at *1–2 (Dec. 4, 2000). That is precisely what happened in this case. The ALJ's hypothetical posed to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ, including, *inter alia*, a tolerance for "routine, non-intense interaction with others in the workplace, including the public, coworkers, and supervisors." R. 16, 56–57. The vocational expert responded that the jobs of inspector, dowels; order clerk, food and beverage; and telephone information clerk could be performed by such an individual. R. 57–58. When the ALJ asked if there was any conflict between the vocational expert's testimony and the Dictionary of Occupational Titles, the vocational expert responded as follows:

> A Your Honor, there's not been any direct conflicts; however, the issue of off-task behavior, absenteeism, occasional change in the work setting, and *limitations to a tolerance with others are not specifically addressed in the DOT*, nor is overhead reaching.[11] Therefore, *I'm relying on U.S. Department of Labor data and statistics,*

---

[11] The ALJ and vocational expert later confirmed that overhead reaching is inapplicable to the relevant hypothetical. R. 60.

> *observation of jobs within the marketplace, and vocational education and training in determining employer tolerances.*

R. 59–60 (emphasis added); *see also* R. 63–64 (confirming that "the interaction with others would fall within the judge's hypothetical"). In other words, the vocational expert explained that her testimony did not directly conflict with the DOT but, to the extent that the DOT did not address issues such as tolerance to others, the expert appropriately relied on the Department of Labor data and statistics, her own observation of jobs, and her vocational education and training when identifying available jobs consistent with the RFC limitations. *Id.*; *see also Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189–90 (3d Cir. 2007) (finding the ALJ did not err in relying on a vocational expert who based his opinion on his thirty years' experience); *Butler v. Colvin*, No. CIV. 13-7488, 2015 WL 570167, at \*9 (D.N.J. Feb. 11, 2015) (noting that Judges in the Third Circuit "have encouraged" vocational experts "to rely on their experiences rather than solely on the DOT"); *Trzeciak v. Colvin*, No. CV 15-6333, 2016 WL 4769731, at \*11 (D.N.J. Sept. 12, 2016) (finding substantial evidence supported the ALJ's determination that the vocational expert's testimony was consistent with the DOT where that expert "merely supplemented the DOT's job description with more specific information based on his own experience and expertise and the National Labor Statistics . . . [and] the VE testified that his testimony was consistent with the DOT").

Plaintiff nevertheless insists that remand is required because data from the Bureau of Labor Statistics addressing social interaction in the jobs identified by the vocational expert conflict with the social limitations in the RFC. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 28–32; *Plaintiff's Reply Brief*, ECF No. 19, p. 9. Although the vocational expert acknowledged that the Bureau of Labor Statistics is a reliable source of vocational information and that she in fact relied on its data, R. 61–62, Plaintiff does not cite to any authority requiring an ALJ to

resolve conflicts between the vocational expert's testimony and data from the Bureau of Labor Statistics. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 28–32; *Plaintiff's Reply Brief*, ECF No. 19, p. 9. Notably, this Court has already explained that an ALJ is required to resolve conflicts only between vocational expert testimony and information in the DOT. SSR 00-4p, 2000 WL 1898704, at *1–2. "[A]ny such apparent conflict between the vocational expert's testimony and other job data publications does not trigger the ALJ's duty to further develop the record. An ALJ is required only to resolve conflicts *sua sponte* between a vocational expert's testimony and the *Dictionary of Occupational Titles* specifically, not other sources of job information." *Lamb v. Kijakazi*, No. 3:21-CV-00907, 2022 WL 16635579, at *13 (M.D. Pa. Nov. 2, 2022) (citing SSR 00-4p, 2000 WL 1898704; *see also Lawrence W. v. Comm'r of Soc. Sec.*, No. CV 21-18959, 2022 WL 16555246, at *5 (D.N.J. Oct. 31, 2022) (rejecting the argument that the ALJ erred by relying only on the DOT to the exclusion of data provided by the Bureau of Labor Statistics because the DOT is a source of reliable job information and where the claimant "cites no authority requiring Judge Sparks to consider more than the DOT data") (citations omitted). The ALJ therefore did not err in relying on the vocational expert's testimony because the ALJ satisfied her duty by asking whether there was any conflict between that testimony and the DOT and such testimony did not give rise to a conflict with the DOT. *See* SSR 00-4p, 2000 WL 1898704, at *1–2; *Horodenski*, 215 F. App'x at 189–90; *Smith v. Comm'r of Soc. Sec.*, No. CV 19-20682, 2020 WL 7396355, at *7 (D.N.J. Dec. 17, 2020) (finding no error in the ALJ's reliance on vocational expert testimony where "the inconsistency that Plaintiff points to is not an inconsistency with the DOT" and "the ALJ fulfilled her obligation by inquiring whether there

was any conflict between the vocational expert's testimony and the DOT"); *Butler*, 2015 WL 570167, at *9; *Trzeciak*, 2016 WL 4769731, at *11.[12]

In continuing to challenge the ALJ's step five determination, Plaintiff contends that the RFC's restriction to simple, routine tasks is inconsistent with the DOT definitions for telephone information clerk and order clerk, food and beverage, occupations that require reasoning level 3.[13] *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 31–32 (citations omitted); *Plaintiff's Reply Brief*, ECF No. 19, p. 9.

---

[12] Moreover, to the extent that there is any conflict with the Bureau of Labor Statistics data, the vocational expert appropriately relied on her education and experience to implicitly resolve such conflict. R. 59–60; *cf. Horodenski*, 215 F. App'x at 189–90; *Butler*, 2015 WL 570167, at *9; *Trzeciak*, 2016 WL 4769731, at *11.

[13] "The qualification categories listed by the DOT for each job include the job's Strength level, General Educational Development ("GED") level, and its Specific Vocational Preparation ("SVP") level." *Zirnsak*, 777 F.3d at 616 (quoting Appendix C, DOT). "GED measures 'those aspects of education (formal and informal) which are required of the worker for satisfactory job performance.'" *Id.* "GED is broken into three categories: (1) reasoning development, (2) mathematical development, and (3) language development. . . . Reasoning levels in the DOT range from level 1 to level 6." *Id.* (citing Appendix C, DOT). GED reasoning level 1 applies "commonsense understanding to carry out simple one- or two-step instructions" in "standardized situations with occasional or no variables in or from these situations encountered on the job." Appendix C, 1991 WL 688702. Reasoning level 2 applies "commonsense understanding to carry out detailed but uninvolved written or oral instructions" in "problems involving a few concrete variables in or from standardized situations." *Id.* Reasoning level 3 applies "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" in "problems involving several concrete variables in or from standardized situations." *Id.* "SVP levels, on the other hand, measure the skill level necessary to perform a particular job." *Zirnsak*, 777 F.3d at 616 (citing SSR 00–4p, 2000 WL 1898704, at *3 (Dec. 4, 2000)). "SVP levels in the DOT range from level 1 to level 9" and "[t]he DOT skill levels correspond with the second source of information relied on by the Commissioner: the CFR." *Id.* (citing SSR 00–4p). The CFR categorizes occupations into three classes: unskilled, semi-skilled, and skilled. 20 C.F.R. § 404.1568(a)–(c). "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time[,]" while "[s]emi-skilled work is work which needs some skills but does not require doing the more complex work duties," and "[s]killed work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." *Id.* at § 404.1568(a), (b), (c). "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3.

For his part, the Commissioner denies that the vocational expert's testimony conflicts with the DOT, contends that the ALJ properly addressed Plaintiff's challenge in her decision, and argues that, in any event and without conceding Plaintiff's points, one of the representative jobs identified by the vocational expert, *i.e.,* inspector, dowels, SVP 2, has a reasoning level 1 and exists in significant numbers that Plaintiff could perform, rendering any purported error harmless regarding the other two jobs with reasoning level 3. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 16, pp. 13–14.

The Court agrees with the Commissioner that, because Plaintiff is capable of performing at least one job with a reasoning level 1 and which exists in significant numbers in the national economy, the Court need not address Plaintiff's detailed arguments based on his challenge to jobs requiring reasoning level 2. As detailed above, the vocational expert testified that there are approximately 35,000 jobs as inspector, dowels, in the national economy. R. 56–58. Based on this record, even if the Court were to accept, for present purposes only, that the jobs of telephone information clerk and clerk, food and beverage, were unavailable to Plaintiff, "the ALJ need only establish that a claimant is capable of performing one job that exists in significant numbers in the national economy." *Pierznik*, 2023 WL 4014468, at *2; *see also Penrose v. Comm'r of Soc. Sec.*, No. 1:20-CV-00011-NLH, 2020 WL 7640585, at *7 (D.N.J. Dec. 23, 2020) ("At the end of the five-step analysis, an ALJ need only establish that a claimant is capable of performing one job that exists in significant numbers in the national economy."). Based on this record, the Commissioner met his burden at step five by showing that at least one job—*i.e.,* inspector, dowels—that existed in significant numbers in the national economy that Plaintiff could perform despite his lessened capacity. *See id.*; *see also* R. 16, 56–58; *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) ("[T]here is no precise estimate for what constitutes 'significant numbers' of

jobs under the Social Security Act.") (citing 20 C.F.R. § 404.1566); *Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x 275, 278 (3d Cir. 2013) ("In light of our determination in *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir.1987), that 200 jobs in the regional economy was a 'clear indication' that other meaningful work in the national economy existed, we conclude that the ALJ did not err by concluding that the 569 jobs available as a surveillance system monitor was evidence of other work in significant numbers in the national economy.").

Plaintiff also complains that the ALJ "improperly considered a properly lodged objection." *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 32–35; *Plaintiff's Reply Brief*, ECF No. 19, pp. 9–10. Plaintiff specifically argues that the ALJ did not address Plaintiff's argument that the jobs identified by the vocational expert required interpersonal interaction with others "far in excess of the hypothetical limitations, but this argument was not addressed by the ALJ beyond a mere mention in a sentence in the Decision." *Plaintiff's Memorandum of Law*, ECF No. 13, p. 33 (citing R. 22, 421). Plaintiff argues that the ALJ's failure to properly analyze his argument constitutes harmful error requiring remand. *Id*. at 33–34 (citing HALLEX I-2-4-48, I-2-6-74); *Plaintiff's Reply Brief*, ECF No. 19, pp. 9–10 (same).

The Court is not persuaded that this issue requires remand. As a preliminary matter, "as an internal manual, HALLEX does not have the force of law[.]" *Moraes v. Comm'r Soc. Sec.*, 645 F. App'x 182, 186 (3d Cir. 2016) (citations omitted). Accordingly, a failure to comply with HALLEX will not serve as an independent basis for remand. *See id*.; *see also Chaluisan v. Comm'r Soc. Sec.*, 481 F. App'x 788, 791 (3d Cir. 2012) ("Internal social security manuals lack the force of law and do not bind the Social Security Administration.") (citations omitted); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007) (stating that HALLEX "lack[s] the force of law and create[s] no judicially-enforceable rights") (citations omitted); *Ungemach v.*

*Comm'r of Soc. Sec.*, No. 1:18-CV-04987, 2019 WL 3024858, at *4 (D.N.J. July 11, 2019)

(stating that the Court "quickly rejects" Plaintiff's request for appeal based on a failure to follow

HALLEX because it is "not [an] independent ground[] for reversal"). In any event, although the

ALJ acknowledged Plaintiff's social interaction argument but did not analyze it in detail, R. 22,

any such purported error is harmless. For the reasons previously explained, an ALJ must resolve

only conflicts between the vocational expert testimony and the DOT. Therefore, Plaintiff's social

interaction argument based on a purported conflict between such testimony and the Bureau of

Labor Statistics did not trigger any duty on the part of the ALJ to consider that argument further.

*See* SSR 00-4p, 2000 WL 1898704, at *1–2; *Horodenski*, 215 F. App'x at 189–90; *Smith*, 2020

WL 7396355, at *7; *Butler*, 2015 WL 570167, at *9; *Trzeciak*, 2016 WL 4769731, at *11.[14]

---

[14] In his opening brief only, Plaintiff also asserts in conclusory fashion that the ALJ failed to
properly consider his request to reopen his 2018 application. *Plaintiff's Memorandum of Law*,
ECF No. 13, pp. 34–35 (arguing that the 2018 application was denied in June 2018 and that he
filed his instant application in June 2019, *i.e.*, within one year of the initial denial of the 2018
application) (citing R. 36). Plaintiff relies on 20 C.F.R. § 404.988(a), which provides that a
determination, revised determination, decision, or revised decision "*may* be reopened". . .
"[w]ithin 12 months of the date of the notice of initial decision, for any reason[.]" The ALJ
expressly acknowledged Plaintiff's request in this regard but denied that request. R. 12 ("The
claimant requested a prior application be reopened, but this request is not granted as this decision
is unfavorable."). As noted above, the ALJ's denial of such a request is discretionary. *See* 20
C.F.R. § 404.988(a) (providing that the ALJ "may" reopen a decision or determination, but is not
required to do so). Notably, a refusal to reopen a Social Security claim is ordinarily not subject to
review under 42 U.S.C. § 405(g). *Califano v. Sanders*, 430 U.S. 99, 107–08 (1977); *see also
Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999) ("It is well settled that federal courts lack
jurisdiction under § 205 to review the Commissioner's discretionary decision to decline to
reopen a prior application or to deny a subsequent application on res judicata grounds."). Of
course, an exception to this general rule exists when a claimant meets the burden of establishing
a "colorable constitutional claim[]." *Id.* at 109. Importantly, this "constitutional issue must
concern the proceeding at which the decision not to reopen was made[;]" a "constitutional claim
relating to the first application is insufficient to confer subject matter jurisdiction over this appeal
of the reopening decision." *Cherry v. Heckler*, 760 F.2d 1186, 1190 n.4 (11th Cir. 1985).
"Otherwise, constitutional claims arising out of an administrative proceeding could be preserved
indefinitely through requests to reopen." *Id.* In the present case, Plaintiff identifies no such
constitutional issue, colorable or otherwise. *See Plaintiff's Memorandum of Law*, ECF No. 13,

In short, the Court finds that the Commissioner carried his burden at step five of the sequential evaluation process and the Court concludes that substantial evidence supports his determination in this regard.

### C.    Constitutionality of Appointment

Finally, Plaintiff challenges the constitutionality of the appointment of former Commissioner Andrew Saul, arguing that his appointment violated the Constitutional separation of powers. *Plaintiff's Memorandum of Law*, ECF No. 13, pp. 35−37; *Plaintiff's Reply Brief*, ECF No. 18, pp. 10−16. This Court has previously rejected similar arguments, reasoning as follows:

> The Plaintiff alleges that the Social Security proceedings in their entirety were constitutionally defective because of the appointment of Andrew Saul as Commissioner of the Social Security Administration. (ECF 10 at 31). The parties agree that 42 U.S.C. § 902(a)(3) violates the separation of powers clause to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause. (ECF 15 at 36). Plaintiff argues that because of this violation, the appointed ALJ and the Appeals Council did not have constitutional authority to render a decision on Plaintiff's case. (ECF 10 at 32).

> While Plaintiff argues to the contrary, the Supreme Court has already stated that there is no basis to conclude that an appropriately appointed official does not have the authority to carry out the functions of the office, even if his or her position was designed by Congress to impermissibly impinge on the President's right to removal at will. *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-88, 1788 n.23, 210 L.Ed.2d 432 (2021) (plurality opinion) ("As we have explained, there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of his office.").

>> The Appointment Clause cases do not help the shareholders either. These cases also ask whether an officer can lawfully exercise the statutory power of his office at all in light of the rule that an office must be properly appointed before he can legally act as an officer.... Here, "[a]ll the officers who headed the FHFA during the time in question were properly appointed." There is thus no barrier to them exercising power in the first instance.

> *Id*. at 1793 (Thomas, J. concurring) (citations omitted).

---

pp. 34–35. Accordingly, Plaintiff's argument based on a denial of his request to reopen will not serve as a basis to remand this action.

Similarly, the Court addressed the idea that the "taint" of the "mere existence" of the offending removal provision flows down through the executive power exercised by the officer was unavailing. *Id*. at 1788, 1793 ("[W]e have not held that a misunderstanding about authority results in a constitutional defect where the action was otherwise lawful.").

The plurality opinion addresses the most pressing issue: that there must be an adequate nexus between the unconstitutional provision and the case at bar. *See id*. at 1779 ("for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of the law that is challenged."). So too do the concurring opinions of Justices Thomas and Kagan: "I write separately because I worry that the Court and the parties have glossed over a fundamental problem with removal-restriction cases such as these: The Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract." *Id.* at 1789 (Thomas, J. concurring). Similarly, "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue." *Id.* at 1802 (Kagan, J. concurring). *See also Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *4-5 (D.N.J. Jan. 6, 2022).

The Court must now consider, then, whether Plaintiff has sufficiently established a concrete injury inflicted by 42 U.S.C. § 902(a)(3) upon Plaintiff through the ALJ's final decision of finding the Plaintiff not disabled and the Appeals Council's denial of review. Without standing, there is no "case or controversy" to be decided. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). Plaintiff argues that both the ALJ and the Appeals Council have inflicted the harm of unconstitutional proceedings against Plaintiff and the subsequent denial of benefits. (ECF 10 at 32).

First, the Third Circuit has already expressly stated that "[n]o statutory authority, (the source of the district court's review) authorizes [district courts] to review the Appeals Council decision to deny review," because the Appeals Council exercises "'certiorari-type jurisdiction,'" and renders an ALJ's decision final under the Social Security Act. *Kwasnik v. Kijakazi*, No. 21-08573, 2022 WL 2358424, at *10, 2022 U.S. Dist. LEXIS 116234, at * 30 (D.N.J. Jun. 30, 2022); *see also Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Thus, this Court does not have the authority to examine the Appeals Council's decision.

Second, the Plaintiff fails to establish a causal connection between the harm of the ALJ's decision and the impermissible removal provision. As discussed above, and as found by other courts, the mere "taint" of the head of an agency does not establish a sufficient nexus for standing. *See Kwasnik v. Kijakazi*, No. 21-08573, 2022 WL 2358424, at *——, 2022 U.S. Dist. LEXIS 116234, at *33-34 (D.N.J. Jun. 30, 2022) (citing *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *6-7 (E.D. Pa. April 18, 2022) ("Justice Alito specified in *Collins* that Seila Law's holding on

standing 'does not mean that actions taken by such an officer are void ab initio and must be undone.' ... [I]t is not difficult to see that *Collins* requires Andino to demonstrate a nexus between the decision denying her disability benefits and 42 U.S.C. § 902(a)(3)."); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case). As a result, the requisite nexus is not met, and the Court denies Plaintiff's appeal on this ground."); *see also Ford v. Kijakazi*, No. 21-1432, 2022 WL 1203731, at *6 (E.D. Pa. Apr. 22, 2022) (denying separation of powers claim because plaintiff failed to show "harm caused by Saul exercising authority he retained by virtue of the unconstitutional removal clause.").

As Justice Kagan noted in *Collins*, for the Court to redress an injury due to an agency decision made by an agency headed by a single executive subject to an impermissible for-cause removal protection, that agency's decision would need to "capture a President's attention." *Collins*, 141 S. Ct. at 1801-02. Justice Kagan specifically noted that the "mass" of Social Security Administration decisions would likely not create a harm that would allow for redress. *Id.* ("[O]nly when the President's inability to fire an agency head affected the complained-of decision. . . is relief needed to restore the plaintiffs to the position they 'would have occupied in the absence' of the removal problem.").

Plaintiff points to a statement by President Biden which purports to indicate that President Biden wanted to fire Commissioner Saul. (ECF 16 at 18). Plaintiff points to the below quote in particular to demonstrate that President Biden wanted to fire the Commissioner from the time of the President's inauguration on January 20, 2021:

> Since taking office, Commissioner Saul has undermined and politicized Social Security disability benefits, terminated the agency's telework policy that was utilized by up to 25 percent of the agency's workforce, not repaired the SSA's relationships with relevant Federal employee unions including in the context of COVID-19 workplace safety planning, reduced due process protections for benefits appeals hearings, and taken other actions that run contrary to the mission of the agency and the President's policy agenda.

*Id.*

First, these harms listed in the news article quote are general and do not show the required concrete, personal, and causal harm required to establish standing. To establish standing, "a plaintiff must show that it has suffered 'an injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins*, 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law

51

that is challenged." *Id*. (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); *see also Kwasnik v. Kijakazi*, No. 21-08537, 2022 WL 2358424, at *11 (D.N.J. Jun. 30, 2022).

Plaintiff does not point to a specific legal application, policy, or decision that the ALJ or Appeals Council rendered that had any effect on this case except for the overall denial of benefits, which as explained above was sufficiently supported by the record. *See Johnson v. Kijakazi*, No. 21-2372, 2022 WL 2342569 at *13, 2022 U.S. Dist. LEXIS 114766 at *36 (E.D. Pa. Jun. 28, 2022) ("Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why [the unlawful] removal clause possibly harmed her.") (internal citations omitted). The unconstitutionally of 42 U.S.C. § 902(a)(3)'s removal restriction simply does not void the ALJ's decision in this mine-run case. The adjudication process and determination by the Social Security Administration remains valid.

*John G. v. Comm'r of Soc. Sec*., No. 1:21-CV-17256-NLH, 2022 WL 3678108, at *10–12 (D.N.J. Aug. 25, 2022). This decision is consistent with this Court's decisions in other cases that considered similar challenges to the constitutionality of the appointment of the Commissioner. *See Sheree J. v. Kijakazi*, No. 1:21-CV-05477-NLH, 2022 WL 3211415, at *8–11 (D.N.J. Aug. 9, 2022) (same); *Rebecca L. v. Comm'r of Soc. Sec*., No. 1:21-CV-13848, 2022 WL 3025908, at *13–14 (D.N.J. July 31, 2022) ("Accordingly, Plaintiff has not alleged any connection between the unconstitutional removal provision in § 902(a)(3) and the ALJ's decision denying Plaintiff benefits, and nothing commands us to vacate the decisions below on that ground. . . . Thus, while the removal clause in § 902(a)(3) violates the separation of powers, it does not independently require the Court to remand or reverse the ALJ's decision absent a showing of compensable harm.") (internal quotation marks and citations omitted); *Daniel M. v. Comm'r of Soc. Sec*., No. CV 21-10533 (RMB), 2022 WL 2952912, at *5–7 (D.N.J. July 26, 2022) ("Plaintiff has failed to show a sufficient nexus between the unconstitutional removal restriction and the ALJ's decision.") (internal quotation marks and citations omitted); *Margaret S. v. Kijakazi*, No. CV 21-13556 (SDW), 2022 WL 2753475, at *8–9 (D.N.J. July 14, 2022) ("Plaintiff has offered no

evidence demonstrating that 42 U.S.C. § 902(a)(3)'s removal restriction caused the denial of her benefits claim or affected the determination of her benefits in any way. . . . As such, further consideration from this Court on Plaintiff's 'separation of powers' argument is not necessary. Accordingly, the final decision of the ALJ is not constitutionally defective and remand is not warranted."); *Kwasnik v. Kijakazi*, No. 3:21-CV-08573, 2022 WL 2358424, at *8–11 (D.N.J. June 30, 2022) ("Plaintiff has failed to show a sufficient nexus between the unconstitutional removal restriction and the ALJ's decision."); *Mor v. Kijakazi*, No. CV 21-1730 (JMV), 2022 WL 73510, at *3–5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case.")). Nothing in Plaintiff's briefing in the instant case persuades this Court that the reasoning in these cases was erroneous. The Court therefore adopts that reasoning and concludes that Plaintiff has not established that remand on this basis is appropriate.

## VI.  CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Date:  June 24, 2024                                   *s/Norah McCann King*
                                                        NORAH McCANN KING
                                                        UNITED STATES MAGISTRATE JUDGE